

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

MAY 1 2 2011

CLERK, U.S. DISTRICT COURT
By_____
                    Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| JAMES EDWARD OWEN, | § | |
| PLAINTIFF, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:10-CV-476-Y |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| COMMISSIONER OF SOCIAL SECURITY, | § | |
| DEFENDANT. | § | |

## FINDINGS, CONCLUSIONS AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE
## AND
## NOTICE AND ORDER

This case was referred to the United States Magistrate Judge pursuant to the provisions of

Title 28, United States Code, Section 636(b). The Findings, Conclusions and Recommendation

of the United States Magistrate Judge are as follows:

### FINDINGS AND CONCLUSIONS

### I.  STATEMENT OF THE CASE

Plaintiff James Owen filed this action pursuant to Sections 405(g) and 1383(c)(3) of Title

42 of the United States Code for judicial review of a final decision of the Commissioner of

Social Security denying his claims for disability insurance benefits under Title II and

supplemental security income ("SSI") benefits under Title XVI of the Social Security Act

("SSA"). On February 24, 2006, Owen applied for disability insurance and SSI benefits alleging

that he had become disabled on December 18, 2005. (Transcript ("Tr.") 7, 45-48, 107-15, 122.)

His applications were denied initially and on reconsideration. (Tr. 7, 49-56, 59-68; *see* Tr. 57-

58.) The administrative law judge ("ALJ") held a hearing on July 3, 2008 and issued a decision

1

on August 18, 2008 that Owen was not disabled. (Tr. 4-18, 19-38; *see* Tr. 97.) Owen filed a written request for review, and the Appeals Council denied Owen's request for review, leaving the ALJ's decision to stand as the final decision of the Commissioner. (Tr. 1-3, 39-40.)

## II. STANDARD OF REVIEW

Disability insurance is governed by Title II, 42 U.S.C. § 404 *et seq.*, and SSI benefits are governed by Title XVI, 42 U.S.C. § 1381 *et seq.*, of the SSA. In addition, numerous regulatory provisions govern disability insurance and SSI benefits. *See* 20 C.F.R. Pt. 404 (disability insurance); 20 C.F.R. Pt. 416 (SSI). Although technically governed by different statutes and regulations, "[t]he law and regulations governing the determination of disability are the same for both disability insurance benefits and SSI." *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

The SSA defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. §§ 423(d), 1382c(a)(3)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed. 20 C.F.R. §§ 404.1520, 416.920 (2009). First, the claimant must not be presently working at any substantial gainful activity. Substantial gainful activity is defined as work activity involving the use of significant physical or mental abilities for pay or profit. 20 C.F.R. §§ 404.1527, 416.972. Second, the claimant must have an impairment or combination of impairments that is severe. 20 C.F.R. §§ 404.1520(c), 416.920(c); *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), *cited in Loza v. Apfel*, 219 F.3d 378, 392 (5th Cir. 2000). Third, disability will be found if the impairment or combination of impairments meets or

2

equals an impairment listed in the Listing of Impairments ("Listing"), 20 C.F.R. Pt. 404, Subpt. P, App. 1. 20 C.F.R. §§ 404.1520(d), 416.920(d). Fourth, if disability cannot be found on the basis of the claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work. *Id.* §§ 404.1520(e), 416.920(e). And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experience. *Id.* §§ 404.1520(f), 416.920(f); *Crowley v. Apfel,* 197 F.3d 194, 197-98 (5th Cir.1999). At steps one through four, the burden of proof rests upon the claimant to show he is disabled. *Crowley,* 197 F.3d at 198. If the claimant satisfies this responsibility, the burden shifts to the Commissioner to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Id.*

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater,* 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen,* 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel,* 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id.* A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* This Court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if the evidence is present. *Harris v. Apfel,* 209 F.3d 413, 417 (5th Cir. 2000); *Hollis,* 837 F.2d at 1383.

### III.  ISSUES

1. Whether the ALJ applied an incorrect legal standard by failing to ask the vocational expert ("VE") whether her testimony conflicted with information contained in the Dictionary of Occupational Titles ("DOT").

2. Whether the ALJ properly evaluated the medical opinion of the state agency medical consultant ("SAMC").

### IV.  ADMINISTRATIVE RECORD

A. Relevant Treatment History[1]

In December 2005, Owen spent one week at John Peter Smith Hospital after attempting suicide by overdose of prescription medications. (Tr. 10, 205.) Based on a psychiatrist's examination, Prabhakaran Gopalakrishnon, M.D. ("Gopalakrishnon"), reported that Owen had a history of depression but that, despite two previous suicide attempts, Owen was not suicidal at the time of discharge. (Tr. 205, 213, 219.) Gopalakrishnon did, however, recommend outpatient drug and alcohol abuse rehabilitation and placement in a halfway house. (Tr. 205, 219.)

On June 17, 2006, Michael Bridgewater, Ph.D. ("Bridgewater"), evaluated Owen based on reports of depression and suicidal thoughts but determined that Owen was not presently contemplating suicide. (Tr. 12, 242, 244.) However, Bridgewater diagnosed Owen with "Depressive Disorder NOS" and recommended psychotherapy as well as medication management of his depression. (Tr. 245.) In the area of social functioning, Bridgewater observed that Owen had lunch or supper with "a friend or two" and was not dating. (Tr. 244.) Furthermore, he noted that Owen's speech was generally on track but that it was occasionally rambling and disconnected. (*Id.*)

---

[1] Because Owen's arguments in his brief raise issues relating solely to his mental impairments, the Court will review only the medical evidence relating to such impairments.

On June 21, 2006, Gregory Phillips, M.D. ("Phillips"), examined Owen and in July reported his findings to Disability Determination Services. (Tr. 265-71.) Owen complained to Phillips of difficulty "getting through his day just due to a lack of energy and motivation" and claimed to have lost his job due to "difficulty in keeping up with his work." (Tr. 10, 267.) Phillips reported that Owen's subjective complaints were supported by the objective data available. (Tr. 11, 269.) Specifically, he opined that Owen suffered from chronic depression and that his psychiatric status was "somewhat fragile." (Tr. 11, 268-69.) He also reported, however, that Owen was alert and oriented with appropriate memory, judgment, and insight. (Tr. 268.) Finally, while Phillips noticed a "somewhat flattened affect," he observed no major disorganization of neuropsychiatric functions and further noted that Owen was not limited in "hearing, seeing, speaking, handling objects, or traveling." (Tr. 11, 269.)

On July 20, 2006, Henry Hanna, Ph.D. ("Hanna"), a SAMC, completed a Psychiatric Review Technique Form. (Tr. 11, 247-60.) Hanna noted that Owen's alleged limitations were not fully supported by the medical evidence but that Owen suffered from "Depression NOS" and "Alcohol Abuse in Partial Remission" that caused him a mild degree of functional limitation in several areas, including the area of social functioning. (Tr. 11, 257, 259.) He further noted that Owen's memory was intact and that his speech was generally on track. (Tr. 259.) On the same day, Hanna also completed a Mental Residual Functional Capacity Assessment, which indicated that Owen could make decisions, concentrate for extended periods of time, interact with others, and respond to changes in a routine working environment. (Tr. 11, 262-63.) Finally, Hanna stated that Owen could understand, remember, and carry out instructions. (Tr. 263-64.)

However, page four of the report extended this assessment to "complex" instructions, while page three limited it to "detailed but not complex" instructions. (*Id.*)

From December 2006 to April 2008, Owen regularly attended appointments at Mental Health Mental Retardation of Tarrant County ("MHMR") where he was often treated by Olusegun Solano, M.D. ("Solano"), Garrick Prejean, M.D., and Susan Hamell, R.N. (Tr. 11, 422-54.) In December 2006, Solano diagnosed Owen with severe depression. (Tr. 500-01.) Over the course of his treatment at MHMR, Owen's treatment goals ranged from wanting to be a functioning member of society to obtaining alternative medication to counter his medications' side effects. (Tr. 422-54.) Medical progress notes throughout his treatment indicated that Owen's doctors consistently rated his overall functioning at a 5 (on a scale from 0 to 10 with 10 being the highest) and considered his speech normal. (Tr. 467-99.)

In April 2007, Susan P. Franks, Ph.D. ("Franks"), conducted a screening of Owen's memory problems after Owen complained of changes in his memory and cognitive functioning dating back seven months. (Tr. 11, 295, 298.) Based on the results of this screening, which included a finding of language impairment, Franks conducted a comprehensive neuropsychological evaluation in May 2007. (Tr. 11, 295-96.) While Franks found that Owen's receptive speech was normal and his Verbal IQ superior, his "expressive ability was noted for long pauses, frequent 'ums,' and word finding difficulty." (Tr. 296.) Overall, Franks concluded that Owen had a Mild Functional Impairment as evidenced by "executive function deficits including mild impairments in planning, decision-making, and motor speed/control" as well as "slowed processing speed across a number of different tasks." (Tr. 11, 297.) She also noted that significant depression most likely exacerbated his impairment and dysfunction. (*Id.*)

6

In January 2008, Owen saw Samuel Coleridge, M.D. ("Coleridge"), complaining of speech problems. (Tr. 12, 539.) Coleridge noted that Owen was producing more saliva than normal and was having trouble "getting words out of [his] mouth." (*Id.*)

B. Administrative Hearing

Owen was born on November 19, 1946, and he completed three years of college, which left him one semester short of earning a Bachelor's Degree. (Tr. 22, 45, 107, 132.) At the July 3, 2008 hearing before the ALJ, Owen testified that he was last employed as a part-time greeter and credit card application solicitor at Kohl's. (Tr. 23.) Before that, he was a shipping and receiving clerk and, subsequently, the manager of Benbrook Antique Mall until being terminated in September 2005. (Tr. 22-23, 26.) Owen described these past jobs as (1) being in the retail setting; (2) involving interaction with supervisors, co-workers, and the public; and (3) requiring an ability to function at a fast pace while dealing with more than one issue at a time. (Tr. 31-32.) He stated that he is no longer employed and that he spends his days running errands, going to the library, and reading or needlepointing at home for brief periods at a time. (Tr. 23-24, 28.)

Owen testified that he suffers from depression, caused mostly by economic and health problems, and from anxiety, triggered by stressful situations. (Tr. 24-25.) He testified that these problems have caused breathing and heart rate concerns, sleeplessness, and suicide attempts. (Tr. 25-28.) He further testified that he, toward the latter part of 2006, began having trouble speaking due to a cognitive impairment, which interfered with his ability to interact with supervisors, other employees, or customers. (Tr. 27-28.) Owen also spoke of difficulty maintaining focus, processing, comprehending, and getting things done on time. (Tr. 29.) Finally, Owen described pain in his knees and legs that has required periodic cortisone

injections, has affected his ability to walk and lift, and caused him to need knee replacement surgery. (Tr. 26-27, 29-30.)

Barbara Dunlap ("Dunlap"), a VE, also testified at the hearing. The ALJ asked her to consider the following hypothetical:

> [A]n individual 61 years of age, high school educated, three years of college work, past relevant work as described. [The individual h]as the residual functional capacity ["RFC"] for sedentary work that could be performed in an environment where there is little interaction with the others. And essentially working with things rather than people. Could that person perform either one of these past jobs?

(Tr. 33.) Based on this hypothetical, Dunlap testified that Owen could not perform his past jobs. (*Id.*) The ALJ next asked Dunlap if there were "[a]ny skills one would have gained from [his] past work that might be transferable to work within this RFC[.]" (*Id.*) Dunlap testified that such transferable skills would be record keeping, scheduling, and report writing. (*Id.*) Dunlap proceeded to state that she "would look at the sedentary, semi-skilled jobs" such as billing clerk, order clerk, and scheduling clerk. (*Id.*) Upon further questioning by Owen's attorney, Dunlap added repair-order clerk and civil-service clerk to the list. (Tr. 34.) Additionally, Dunlap stated that sedentary, semi-skilled clerk positions number six to eight thousand in Texas and over 90,000 in the national economy. (Tr. 33.) The remainder of Dunlap's testimony regarded whether these jobs entailed changes in tools, specifically whether Owen must learn to use computer programs, issues not relevant to this review. (Tr. 34-37.)

C. ALJ Decision

On August 18, 2008, the ALJ concluded that Owen met the insured status requirements of the SSA through December 31, 2010. (Tr. 9.) He further found that Owen had not engaged in

any substantial gainful activity since December 18, 2005, the alleged onset date of disability. (*Id.*) While the ALJ determined that Owen's mild cognitive impairment and depression did not constitute severe impairments, he determined that Owen's osteoarthritis did. (Tr. 9-10.) He held that none of Owen's impairments, however, met or equaled any impairment in the Listing. (Tr. 13.)

As to Owen's RFC, the ALJ stated that, based on Owen's testimony, Owen had the ability to perform sedentary work but was limited to "little interaction with others" due to his difficulty speaking, not due to his mental impairments. (Tr. 13, 16.) In support of this RFC assessment, the ALJ stated, as relevant here:

> At the time he filed his initial application, claimant reported the following. He was very tired and did not have and could not generate the energy level that he needed to have. His lack of energy triggered his depression. When he tried to do something, he got very tired and his legs gave way. He stopped working because his symptoms got worse. . . . On an average day he dressed, ate three meals, and tried to do a project of some sort. He left the house several times a week to grocery shop or visit friends and was able to complete household chores. Sometimes he confused planning to do something with having actually done it; if interrupted mid-task he often forgot to return to the task and became frustrated or tense because of a loss of control.

> When filing his requests for reconsideration, claimant reported the following. He had increased depression and anxiety, lack of energy and interest and cognitive problems. He was sleeping poorly because of restlessness. Sleeplessness affected his daily routine. He fell and injured himself. He had pain in his legs, reduced grip and strength in his fingers, and doing laundry had become a problem. He had trouble thinking, planning and lost his words.

> At the hearing, claimant testified as follows. . . . He has had speaking problems since 2006. He was diagnosed with mild cognitive impairment and has problems processing and comprehending.

> . . . .

After considering the evidence in the record, I find that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment for the reasons explained below.

In reaching my decision I considered all the medical evidence and claimant's own statements. I find that the claimant is not fully credible. . . .

The State agency medical consultant, Dr. Hanna, stated that the alleged limitations caused by claimant's mental symptoms are not fully supported by the medical evidence. Claimant has seen multiple doctors complaining of multiple mental symptoms and very little medical reason has been found to sustain several of his complaints: Dr. Franks found only a Mild Cognitive Impairment, which does not support the severity of claimant's complaints regarding his failing memory and poor cognitive functioning; an EEG showed only mild to moderate abnormality, while a PET/CT scan was normal; and, claimant's comprehensive polysomnogram revealed only periodic limb movements, which does not support claimant's complaints regarding his sleeplessness. Claimant's credibility is further diminished by several statements made during vocational counseling sessions. In a meeting with his vocational counselor in February 2007 claimant stated that the felt like he could go back to work. In October 2007 claimant reported to his counselor that he felt like his depression was under control with medication. At both times claimant was pursuing Social Security benefits.

. . . .

In terms of claimant's alleged symptoms caused by his depression, the medical evidence shows that claimant does have depression and that his depression could cause some of his stated symptoms[;] however, his mental evaluation and diagnostic testing have not shown such significant deficits as to warrant a finding of disability.

(Tr. 14-16 (internal citations omitted).)

Based on the RFC assessment, the ALJ opined that Owen was not able to perform his past relevant work but that there were a significant number of jobs that existed in the national economy that Owen could perform. (Tr. 16.) Consequently, the ALJ found Owen was not disabled. (Tr. 7, 17.)

10

# V. DISCUSSION

## A. ALJ's Failure to Discover Potential Conflict

The first issue is whether the ALJ applied an incorrect legal standard by failing to ask Dunlap, the VE, whether her testimony conflicted with the Dictionary of Occupational Titles ("DOT").

### 1. SSR 00-4p Requirements

When determining whether the claimant could adjust to alternative work that is within his RFC and that exists in significant numbers in the national economy, the ALJ may consult several sources, including the DOT and a VE. 20 C.F.R. § 404.1566(a), (d), (e). The availability of more than one approved source, however, presents the risk of conflict between the DOT's job descriptions and the VE's opinion regarding both the claimant's ability and the jobs' availability. *Gaspard v. Soc. Sec. Admin, Comm'r*, 609 F. Supp. 2d 607, 613 (E.D. Tex. 2009).

Because this type of conflict surfaced somewhat frequently, the Commissioner issued a Social Security Ruling ("SSR") 00-4p to ensure that ALJs would expose and reconcile such conflict before relying on VE testimony. *Id.*; SSR 00-4p, 2000 WL 1898704 (Dec. 4, 2000). Specifically, the ruling unambiguously establishes the ALJ's affirmative duty to bring to light and explain any possible conflict between the VE's testimony and the DOT:

> When a VE . . . provides evidence about the requirements of a job or occupation, the adjudicator has *an affirmative responsibility to ask* about any possible conflict between that VE . . . evidence and information provided in the DOT. In these situations, the *adjudicator will*:
>
> > Ask the VE . . . if the evidence he or she has provided conflicts with information provided in the DOT; and

11

> If the VE's . . . evidence appears to conflict with the DOT, the adjudicator
> will obtain a reasonable explanation for the apparent conflict.

SSR 00-4p, 2000 WL 1898704, at *4 (emphasis added).

## 2. SSR 00-4p Violation in the Present Case

Social Security rulings represent "statements of policy and interpretations" adopted by the Social Security Administration that are "binding on all components" of the Administration. 20 C.F.R. § 402.35(b)(1). While binding on the Administration, these interpretive rulings are not binding on the courts, so courts need not give them the force and effect of law. *Batterton v. Francis*, 432 U.S. 416, 425 n.9 (1977) (noting the varying degrees of deference the rulings may be afforded); *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001) (per curiam). However, courts may, as the Fifth Circuit frequently has, "rel[y] upon the rulings in evaluating ALJs' decisions." *Myers*, 238 F.3d at 620.

An ALJ's violation of a ruling, in general, is reversible legal error, provided that the error results in prejudice. *Hall v. Schweiker*, 660 F.2d 116, 119 (5th Cir. 1981) (per curiam) ("Should an agency in its proceedings violate its rules and prejudice result, the proceedings are tainted and any actions resulting from the proceeding cannot stand."). A claimant establishes the requisite prejudice by showing that, "if the ALJ had fully developed the record," additional evidence would have been produced that "*might* have led to a different decision." *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000) (emphasis added). Although the Fifth Circuit has not decided, in particular, whether an ALJ's failure to abide by SSR 00-4p is legal error, *DeLeon v. Barnhart*, 174 Fed. Appx. 201, 203 (5th Cir. 2006) (not reaching the issue),[2] other circuits have held that

---

[2] Unpublished Fifth Circuit opinions are not precedent but may be persuasive. 5th Cir. R. 47.5.4. *See also*

this precise violation constitutes legal error warranting remand. *See, e.g., Prochaska v. Barnhart*, 454 F.3d 731, 735-36 (7th Cir. 2006) (noting that the ALJ's legal error in failing to ask about conflict negated the claimant's responsibility to raise the issue); *Burns v. Barnett*, 312 F.3d 113, 126-27 (3d Cir. 2002) (remanding for the ALJ to handle the conflict in accordance with SSR 00-4p).

Also persuasive to this Court is the holding by the Eastern District of Texas that a violation of SSR 00-4p constitutes legal error and that remand is warranted upon a finding of prejudice. *Romine v. Barnhart*, 454 F. Supp. 2d 623, 628 (E.D. Tex. 2006). In *Romine*, the ALJ did not perceive that any conflict existed and, thus, did not ask about any potential conflict. *Id.* In the written decision, the ALJ stated, "The vocational expert testified that the information provided conforms to the Dictionary of Occupational Titles." *Id.* Noting that the ALJ was mistaken, the *Romine* court clarified that the hearing transcript did not reveal any such testimony by the VE. *Id.* Indeed, the VE simply "recited DOT codes for the jobs she identified" but did not "acknowledge, discuss, distinguish or reconcile" the DOT requirements with the hypothetical limitation. *Id.* Recognizing that each job identified by the VE presented the conflict, the court held that prejudice was self-evident because the VE might change her mind when presented with the conflict or that the ALJ might not be satisfied with the VE's attempt to dismiss the conflict. *Id.* at 628-29.

Just as in *Romine*, the ALJ in this case did not ask about potential conflict. (Tr. 33-38.) Also, much like the ALJ did in *Romine*, the ALJ in this case stated, "Pursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the [DOT]." (Tr.

---

*Romine v. Barnhart*, 454 F. Supp. 2d 623, 627 (E.D. Tex. 2006).

17.) Whether this was a mistake or simply a standard remark included as a matter of course, the transcript of the hearing in the present case does not include any testimony acknowledging, discussing, distinguishing, or reconciling the DOT requirements with Owen's speech limitation. (Tr. 33-38.) Instead, the VE merely "recited DOT codes for the jobs she identified." (Tr. 33-34.) Therefore, just as in *Romine*, the ALJ's failure to ask about potential conflict is reversible legal error if it prejudiced Owen. *See Romine*, 454 F. Supp. 2d at 628.

### 3. Prejudice to Owen

The ALJ's failure to adhere to SSR 00-4p prejudiced Owen because the evidence that would have resulted from compliance with the ruling might have led to a different decision. *See Newton*, 209 F.3d at 458. If the ALJ had asked the VE whether her testimony conflicted in any way with the DOT's job descriptions, the VE's response could have summarily stated that no conflict existed, resulting in the same decision. Conversely, however, the same question could have prompted a discussion regarding what kinds of "interaction with others" these positions entail under the DOT and how those levels of interaction are or are not compatible with Owen's limitation.

Indeed, according to the DOT's supplement, three of the five positions that the VE identified (civil-service clerk, order clerk, and scheduler) require talking one-third to two-thirds of the time or "[f]requently." Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles C-3, C-4, 331, 336, 339, 341 (1993) [hereinafter SCO]. Identification of these three jobs created tension between a limited ability to interact with others and a need to work with things rather than people, on the one hand, and the requisite ability to talk frequently, on the other. The Court can only speculate as to whether the ALJ would have

14

ultimately reconciled the conflict and arrived at the same conclusion. However, a finding of prejudice merely requires that this additional evidence "*might* have led to a different decision." *See Newton*, 209 F.3d at 458 (emphasis added). This is satisfied because it is not only possible, but indeed quite likely, that this evidence would have caused the ALJ to decide differently due to the seemingly inherent incompatibility between a limitation on interaction with others, which the ALJ expressly imposed due to Owen's difficulty speaking, and the requirement for frequent talking. But this Court need not establish this with certainty; that determination will be made on remand after "the ALJ ha[s] fully developed the record." *See id.*

In *Romine*, prejudice existed where the conflict applied to all four identified jobs. However, while two out of the five designated jobs in this case do not require frequent talking,[3] prejudice still exists in this case. Indeed, this Court has previously found prejudice even when the claimant could still perform some of the jobs identified by the VE. *Otte v. Comm'r, Soc. Sec. Admin.*, No. 3:08-CV-2078-P, 2010 WL 4363400, at *13 (N.D. Tex. Oct. 18, 2010) (Stickney, Mag. J.). In *Otte*, the VE did not quantify how many jobs were available after the conflicting jobs were removed from consideration. *Id.* This Court reasoned, "Although he gave two examples of [compatible] jobs, without knowing how many of these jobs exist, the Court is unable to determine whether they exist in significant numbers in the local and national

---

[3] While two positions, billing clerk & repair-order clerk, do not require frequent talking, these positions require a verbal aptitude in the middle third of the population, which represents a medium degree of aptitude ability. DICOT 214.362-042, 1991 WL 671876; DICOT 221.382-022, 1991 WL 672030. Also, the same three jobs previously discussed require "dealing with people" as an important temperament factor. DICOT 205.362-010, 1991 WL 671708; DICOT 221.367-066, 1991 WL 672022; DICOT 249.362-026, 1991 WL 672320. While aptitude and temperament levels do not appear in the DOT or any other authoritative source, they at least reveal possible points worth mention on remand. *Burns,* 312 F.3d at 128 & n.9 (noting that the VE can be examined on remand "based on the aptitude level required for a job as detailed in other occupational handbooks"); *see Gaspard*, 609 F. Supp. 2d at 616-17 (noting that the SCO and the Department of Labor's Revised Handbook for Analyzing Jobs arguably complement each other).

economies." *Id.*; *see Bagwell v. Barnhart*, 338 F. Supp. 2d 723, 737-38 (S.D. Tex. 2004) ("While the other two jobs suggested by the VE do not require frequent stooping, the VE's testimony does not distinguish as to each job whether work exists in significant numbers in the national economy for the particular job. Thus, there is insufficient evidence demonstrating that, absent the library page job, work that Bagwell could perform exists in significant numbers in the national economy.").

Similarly, in this case, the VE did not specify how many of the statewide and nationwide "sedentary, semi-skilled" clerk positions require frequent talking or are otherwise incompatible with "little interaction with others." (Tr. 33.) Therefore, just as in *Otte*, the possibility that two jobs remain within Owen's RFC does not prevent a finding of prejudice. *See Otte*, 2010 WL 4363400, at *13. The record does not establish that these positions exist in sufficient numbers in the national economy such that the ALJ would have arrived at the same decision despite discovering the conflict posed by the other three jobs. Accordingly, the ALJ's failure to abide by SSR 00-4p prejudiced Owen, and remand is warranted. *See Newton*, 209 F.3d at 458.

### 4. Commissioner's Claim of Waiver

The Commissioner argues, citing *Carey v. Apfel*, 230 F.3d 131, 146-47 (5th Cir. 2000), that Owen's failure to raise the conflict at the hearing essentially waived his present challenge. (Resp. 5.) This Court's consideration, and ultimate dismissal, of the Commissioner's claim of waiver warrants a discussion of the types of conflict that can exist and the deference this circuit gives to the ALJ's decision depending on which conflict is present.

Before SSR 00-4p became effective, the Fifth Circuit decided *Carey* to resolve whether VE testimony that conflicts with the DOT can provide substantial evidence to support the

Commissioner's decision. *Carey*, 230 F.3d at 143-45 (identifying the various positions taken by other circuits). The Fifth Circuit joined the majority of circuits in adopting a "middle ground approach," under which "neither the DOT nor the vocational expert testimony is per se controlling." *Id.* at 146-47. However, under this approach, the ALJ's "discretion to choose between conflicting evidence is not unfettered" and in part depends on the nature of the conflict. *Romine*, 454 F. Supp. 2d at 627; *see Carey*, 230 F.3d at 146-47.

*Carey* identified three types of conflict and limited its holding to "implied or indirect" conflict, which is characterized as being tangential in nature and unapparent until further inference is made. *Carey*, 230 F.3d at 145-47. In *Carey*, the claimant had only one arm, and the jobs in question required manual dexterity. *Id.* at 146. The court decided the conflict was implied or indirect because it did not even become apparent until "further inference is made that the jobs require manual dexterity with, not one, but two hands." *Id.* The court held that, to the extent the VE's testimony impliedly or indirectly conflicts with the DOT, "the ALJ may rely upon the [VE]'s testimony provided that the record reflects an adequate basis for doing so." *Id.* In so holding, the court reasoned that a claimant who did not raise implied conflict at the administrative hearing cannot be permitted to thereafter peruse the record in search of such conflict to present as reversible error. *Id.* at 146-47.

*Carey* distinguished implied or indirect conflict from two other types of conflict: (1) the "direct and obvious" conflict, which exists when the VE's testimony conflicts with the DOT, and (2) the "less obvious" conflict, which arises when the VE's testimony "creates a conflict or discrepancy between the ALJ's [RFC] determination . . . and the DOT job descriptions." *Id.* at 145-46. Courts have continued to treat both the "direct and obvious" conflict and the "less

obvious" conflict as "direct conflicts," a category of conflicts separate and distinct from the implied or indirect conflict. *See Graham v. Comm'r of Soc. Sec. Admin.*, No. 3:08-CV-2133-N (BH), 2009 WL 3199382, at *7 (N.D. Tex. Oct. 2, 2009) (Ramirez, Mag. J.); *Augustine v. Barnhart*, No. 1:00-CV-749, 2002 WL 31098512, at *9 (E.D. Tex. Aug. 27, 2002) (referring to obvious conflict and less obvious conflict as "direct conflict scenarios").

While *Carey* did not squarely decide what standard applies to direct conflict, *Carey*, 230 F.3d at 146-47, district courts in this circuit have held that a claimant's failure to raise a direct and obvious conflict does not amount to waiver and that it is still the ALJ's burden to inquire about such conflict. *See, e.g., Romine*, 454 F. Supp. 2d at 630 (recognizing that *Carey* was limited to "extraordinary and extreme" situations involving implied or indirect conflict and that "one should not assume that *Carey* . . . articulate[d] a rule of general application in all circumstances"); *Cooper v. Comm'r of Soc. Sec. Admin.*, No. 3:09-CV-1302-BF, 2011 WL 61613, at *7-8 (N.D. Tex. Jan. 6, 2011) (Stickney, Mag. J.) (dismissing the waiver claim because it only applies to implied or indirect conflict); *Baty v. Barnhart*, 512 F. Supp. 2d 881, 893-94 (W.D. Tex. 2007) ("[T]he [direct] conflict present in this case was specifically excepted in the *Carey* case. Pursuant to the burden that is placed on the Commissioner in step 5 of the analysis and the ALJ's duty to fully develop the record, error was committed . . . ." (internal citations omitted)).

The conflict in this case is the "less obvious" direct conflict that exists when the VE's testimony "creates a conflict or discrepancy between the ALJ's [RFC] determination . . . and the DOT job descriptions." *Carey*, 230 F.3d at 145-46. Indeed, the VE did not testify specifically regarding Owen's limitations but simply identified five positions within his RFC that would

involve his transferable skills. (Tr. 33.) However, identification of these jobs presented a conflict between the three DOT job descriptions that required frequent talking and the ALJ's RFC determination, which restricted Owen to "limited interaction with others" based on difficulty speaking. *Compare* DICOT 205.362-010, 1991 WL 671708, *and* DICOT 221.367-066, 1991 WL 672022, *and* DICOT 249.362-026, 1991 WL 672320, *with* Tr. 13, 16, 33.

This is not the type of tangential or inferential conflict at issue in *Carey* that is only discovered by the claimant subsequently perusing the record in search of such conflict to submit as reversible error. *See Carey*, 230 F.3d at 146-47. Presented with testimony that three jobs required frequent talking, the ALJ would have immediately recognized the inherent conflict between that requirement and a limitation that he expressly imposed due to Owen's difficulty speaking. Compare this with a hypothetical involving slightly inverted facts that would have made this conflict implied or indirect. Had the ALJ restricted Owen to "limited talking" and had the DOT job descriptions required "frequent interaction with others," the conflict might then be implied or indirect. In that scenario, an inferential step might be necessary for the ALJ to determine whether the required interaction necessarily involved talking, as opposed to a form of electronic interaction. However, in this case, the ALJ premised the limitation specifically on Owen's difficulty speaking, so the conflict between that and frequent talking would have been quite apparent on its face, unlike the implied conflict in *Carey* or in the hypothetical scenario. *See Carey*, 230 F.3d at 146-47.

Because the conflict in this case is direct, albeit the "less obvious" type, Owen did not need to raise the conflict at the hearing or risk waiving it. Instead, the ALJ retained the burden at step five of the analysis to fully develop the record. *See Baty*, 512 F. Supp. 2d at 893-94. Thus,

19

the Commissioner's claim of waiver fails, and the ALJ's failure to question the VE regarding this direct conflict warrants remand.

### B. ALJ's Evaluation of the SAMC's Medical Opinion

Because remand is required pursuant to the ALJ's error in failing to identify and address the conflict as set forth above, the Court does not consider the remaining issue raised by Owen regarding the ALJ's failure to discuss Hanna's statement on page four of his report that "the claimant can understand, remember and carry out detailed *but not* complex instructions." (Tr. 264 (emphasis added).) However, upon remand, the Court is certain that the ALJ will reconcile this statement with the contradictory statement on page three of Hanna's report and will adjust Owen's RFC if warranted. (*See* Tr. 263.)

## RECOMMENDATION

It is recommended that the Commissioner's decision be reversed and remanded for further administrative proceedings consistent with these proposed findings of fact and conclusions of law.

## NOTICE OF RIGHT TO OBJECT TO PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATION AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within fourteen (14) days after the party has been served with a copy of this document. The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made. *See* 28

U.S.C. § 636(b)(1). Failure to file, by the date stated above, a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

### ORDER

Under 28 U.S.C. § 636, it is hereby ORDERED that each party is granted until May 26, 2011 to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation. It is further ORDERED that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further ORDERED that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED May 12, 2011.

_____
JEFFREY L. CURETON
UNITED STATES MAGISTRATE JUDGE

JLC/knv

21